UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DAVID PRINGLE,

    Plaintiff,

v.                                                    Case No: 6:24-cv-835-JSS-DCI

SEMINOLE COUNTY PUBLIC
SCHOOLS,

    Defendant.
_____/

## ORDER

In this action brought under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101–12213, Defendant, Seminole County Public Schools, moves to dismiss the complaint (Dkt. 1) as a shotgun pleading, for failure to exhaust administrative remedies, and for failure to state a claim. (Dkt. 7.) Plaintiff, David Pringle, proceeding pro se, opposes the motion. (Dkt. 13.) Upon consideration, for the reasons outlined below, the court grants the motion.

### BACKGROUND[1]

Plaintiff has worked for Defendant as a full-time, state-certified teacher since January 2007. (Dkt. 1 at 4.) He currently teaches online through Seminole County Virtual School (SCVS). (*Id.* at 4–5.) Plaintiff has "[m]ajor [d]epression"—a "chronic,

---

[1] The court accepts the well-pleaded factual allegations in the complaint as true and construes them in the light most favorable to Plaintiff. *See Harry v. Marchant*, 291 F.3d 767, 769 (11th Cir. 2002) (en banc).

relapsing condition" affecting his concentration, motivation, appetite, and sleep. (Dkt. 1-11 at 1; *accord* Dkt. 1-12 at 1; *see* Dkt. 1-3 at 1.) In 2015, Plaintiff "ha[d] problems" with some students, which presumably aggravated his condition. (Dkt. 1-11 at 1.) In response, Plaintiff requested that Defendant accommodate his condition by transferring either him or the students to a different school. (*Id.*) Plaintiff requested various other accommodations, as well, including that Defendant "modify [the] work environment, policies, practices, [and] supervisory methods" applicable to him as necessary, "[a]llow for relocation of classes, schools, [and] students," "not mandate [his] attendance at non[]essential social functions," and allow him to take "quick . . . breaks" during work and to "work from home on workdays." (Dkt. 1-12 at 1.) Defendant allegedly granted these requests by not mandating Plaintiff's attendance at nonessential social functions and by transferring him to SCVS so he could teach online at home. (*See* Dkt. 1 at 5, 7.)

Plaintiff complains of eleven incidents that took place from 2016 to 2023. (*Id.* at 5–7.) The members of the school administration involved in the incidents are Dr. Deborah Camilleri (the SCVS principal), Dr. Michelle Backel (the SCVS assistant principal), Dr. Courtney Kavanaugh (a SCVS supervisor), Mrs. Serita Beamon (the superintendent), Mr. Mark Russi (Assistant Superintendent of Human Resources and Professional Standards), Dr. Shawn Gard-Harrold (Assistant Superintendent of ePathways), Mr. Ryan Dufrain (the head of Defendant's human resources department), and Ms. Carianne Reggio (a human resources director for Defendant). (*See id.*; Dkt. 1-4 at 1; Dkt. 1-8 at 1.) As alleged, the incidents include Dr. Camilleri's

- 2 -

reprimanding of Plaintiff in 2016, training Plaintiff was required to attend in December 2018, Dr. Kavanaugh's negative rating of Plaintiff's performance in 2019, a letter of concern Dr. Kavanaugh included in Plaintiff's employment file in May 2020, the initial inaction with which Plaintiff's reports of disability discrimination were met in 2021, Mr. Dufrain's investigation into the reported discrimination in late 2021, the decision in January 2022 not to allow Plaintiff's son (a SCVS student) to get a better grade on an incomplete assignment, the tasks Dr. Backel required of Plaintiff during an outdoor school event in May 2022, the decision in May 2023 not to consider Plaintiff for a coaching position at one of Defendant's other schools, Dr. Backel's conduct regarding a student in one of Plaintiff's online courses in September 2023, and Plaintiff's in-person proctoring of a standardized test in November 2023, which led Mrs. Beamon to put Plaintiff on administrative leave. (*See* Dkt. 1 at 5–7.)

During a meeting at the end of the 2016 school year, Dr. Camilleri allegedly gave Plaintiff two reprimands: for wearing an outfit to graduation that did not meet her dress standards and for failing to attend an off-campus luncheon. (*Id.* at 5.) Plaintiff "wore a dress shirt and gr[a]y slacks" to graduation. (*Id.*) According to him, Dr. Camilleri did not have "an established dress code policy" and did not subject other teachers to the dress standards to which she subjected him. (*Id.*) Plaintiff thus alleges that the graduation-related reprimand amounted to disability-based harassment and disparate treatment. (*Id.*) He also claims that the luncheon-related reprimand failed to comply with the accommodation that Defendant avoid mandating his attendance at nonessential social functions. (*Id.*)

During a meeting in December 2018, Dr. Camilleri allegedly told Plaintiff: "[Y]ou know that your anxiety comes out when you are speaking to these parents." (*Id.*) Plaintiff alleges that she "had no evidence to support th[is] claim" about his condition. (*Id.*) "Nevertheless," Plaintiff claims, he "was required to come onto campus" to attend mandatory training "for the last week of the semester." (*Id.* at 5–6.) In contrast, "other teachers at [Plaintiff's] school . . . [we]re allowed to work from home." (*Id.* at 5.) Allegedly, during the training, for which Plaintiff "was not offered training points," Plaintiff had to sit in "cafeteria[-]style chair[s]" in "empty rooms for multiple hours during multiple days" with "no access to daylight." (*Id.* at 6.) He was also "placed in a back classroom that was . . . used as a storage room, with substantial fluorescent lighting." (*Id.*) In Plaintiff's view, he was required to come to campus and was subjected to this "punitive" work environment in retaliation for his ADA-protected status. (*Id.* at 5–6.)

During the 2019 school year, Dr. Kavanaugh gave Plaintiff an "[u]nsatisfactory" job performance rating—"the lowest [rating] a teacher c[ould] get in [the] evaluation system." (*Id.* at 6.) A paragraph of comments supported the rating:

> Over the past month, we have received complaints about [Plaintiff's] interactions with students. Two students reported that they needed a new instructor because [Plaintiff] was "rude"[ and] "gruff," and they often felt like crying or were actually crying after speaking with him. Based on feedback from last school year, this is not a new behavior. I have had similar contacts from parents and students reporting nearly the same thing. We have met with [Plaintiff] about this[,] and he is aware of the feedback from the parents and students. He is currently working to record himself in order to reflect on his conversations with students. In addition, we also had another parent write to us about his interactions with her two children stating that he just seemed like he "had better things to do."

(Dkt. 1-9 at 1.) This evaluation was Plaintiff's first unsatisfactory rating in his seventeen-year career. (Dkt. 1 at 6.) Plaintiff claims that in retaliation for his ADA-protected status, Dr. Kavanaugh failed to consider "any positive feedback . . . for [his] interactions with students and parents." (*Id.*) According to Plaintiff, the negative evaluation "led to a loss of" future bonus and employment opportunities. (*Id.*)

In May 2020, Plaintiff claims Dr. Kavanaugh included in his employment file a letter of concern involving "a parental complaint." (*Id.*) Plaintiff states that during a recorded conversation with a parent, he invoked a school board policy on civility and the parent retaliated with the complaint. (*Id.*) Allegedly, although the SCVS administration knew that the parent had complained in retaliation for Plaintiff's invocation of the civility policy, and although the administration had access to the record of the conversation, it "failed to take into account this evidence" and thus "treated [Plaintiff] differently" from "[a]ll other employees at [the] school," who "[we]re granted . . . protection" under the policy. (*Id.*) Plaintiff claims that the inclusion of the letter in his file "led to the loss of potential job placement in the future and [to] the potential for direct economic harm." (*Id.*)

Early in 2021, Plaintiff sought to remedy his alleged mistreatment—and especially to remove the letter of concern from his file—with the help of school board members, who referred him to Mr. Russi and Dr. Gard-Harrold. (*Id.*; *see* Dkt. 1-4 at 1.) Mr. Russi told Plaintiff that Plaintiff "should have come to" him sooner because it was then too late to remove the letter from the file. (Dkt. 1 at 6.) On March 3, 2021,

Mr. Russi emailed Ms. Reggio "for a formal investigation" into Plaintiff's reported disability discrimination. (*Id.*) On March 9 and April 2, 2021, Plaintiff sent emails following up on Mr. Russi's request because "[n]o one from Ms[.] Reggio's office had contacted [Plaintiff] about the investigation." (*Id.*) When Plaintiff met with Ms. Reggio in August 2021, she purportedly encouraged him to "drop the issues" and stated: "[T]his could get ugly." (*Id.*) In Plaintiff's words, her "comments were not productive under the ADA's requirement for an interactive process[,] and they created a hostile, adversarial environment." (*Id.*) After this meeting, Plaintiff claims, Defendant's human resources department "ignored [his] complaints." (*Id.*) On October 14, 2021, Plaintiff emailed "all school board members" about his alleged mistreatment. (*Id.*) According to Plaintiff, "[n]o investigation was done" at this time. (*Id.*) Due to "neglect and apathy," Plaintiff states, his "requests and accusations of harassment were not" timely considered, and the "delay in action . . . placed an undue burden on [his] performance." (*Id.*)

In November 2021, Mr. Dufrain took charge of Defendant's human resources department and met with Plaintiff to discuss the alleged disability discrimination. (*Id.*) Mr. Dufrain investigated Plaintiff's allegations but deemed the December 2018 training to be beyond the scope of the investigation. (*Id.* at 7.) Plaintiff claims that the training was not beyond the scope because it was "specifically mentioned" in the 2020 letter of concern. (*Id.*) Mr. Dufrain wrote a report based on his investigation. (*Id.*) From the complaint, it appears that Mr. Dufrain's report relied on phone interviews

conducted with Dr. Camilleri and Dr. Kavanaugh on October 19, 2021, at 2:00 PM and 3:00 PM, respectively. (*See id.*; Dkt. 1-7 at 1; Dkt. 1-8 at 1.) Notes from Dr. Camilleri's interview relate that she "received many complaints about [Plaintiff] and how he 'fl[ew] off the handle' with parents and students," that she gave him an "audio recording device" so he could "protect himself from false accusation[s] from parents," and that she required him to choose "three examples of [recorded] phone calls with just him speaking with students" for him to submit to Dr. Kavanaugh. (Dkt. 1-7 at 1.) These notes mention a meeting about the recordings attended by Dr. Camilleri, Dr. Kavanaugh, Plaintiff, and his union representative, which Plaintiff first "pause[d] so he could speak to his union representative" and then "abruptly ended" due to a panic attack. (*Id.*) Further, according to the notes, when Dr. Camilleri gave Plaintiff "a letter of concern and directive for missing a mandatory meeting," Plaintiff did not rebut the directive. (*Id.*) Notes on Dr. Kavanaugh's interview seem to address a specific exchange between Plaintiff and a student. (*See* Dkt. 1-8 at 1 (referring to "the transcripts of the conversation between [Plaintiff] and the student").) However, as to Plaintiff's general performance, these notes state that the administration had "many conversations with [Plaintiff] about speaking with respect to parents on the phone" because parents said that Plaintiff "[went from zero to sixty] on the phone," "lashe[d] out at parents and students," and was "emotional," "rude," and "stressed." (Dkt. 1-8 at 1.) The notes reflect Dr. Kavanaugh's position that Plaintiff's "text with students was not the issue," and they report that Plaintiff received training "to help him deal with difficult" and "anxious parents." (*Id.*) Additionally, according to the notes, Dr.

- 7 -

Kavanaugh corroborated Dr. Camilleri's statements about the recording device and the meeting. (*Id.*) Citing to the notes for both interviews, Plaintiff complains that Mr. Dufrain did not include in his report any positive feedback from the administration even though the "administration ha[d] access to the parental feedback from [the school's] website." (Dkt. 1 at 7.) Presumably, then, that parental feedback contained positive comments that the administration could have—but did not—share about Plaintiff's performance for Mr. Dufrain's investigation. (*See id.*) Regarding the investigation, Plaintiff claims that he was "treated differently from other teachers," he "was not . . . taken seriously" due to "neglect and apathy," and evidence in his favor was not considered, in violation of due process. (*Id.*)

In January 2022, Plaintiff's son, who attended SCVS, was allegedly not allowed to receive a grade of 50% on an incomplete assignment despite a November 2021 "survey . . . indicating" that for reasons related to school funding and the coronavirus pandemic, students at the school could do just that. (*Id.*) Plaintiff discussed the issue with Dr. Camilleri and Mrs. Beamon, to no avail. (*Id.*; *see* Dkt. 1-4 at 1.) He alleges that the decision not to allow his son to receive a better grade was retaliation for Plaintiff's ADA-protected status. (Dkt. 1 at 7.)

In May 2022, SCVS held a mandatory outdoor event called 8th Drive Through for students on campus. (*Id.*) The equipment for the event included an "extra large tent and . . . chairs." (*Id.*) Plaintiff claims that after it started raining, the employees in attendance, himself included, "were asked to break down the . . . tent and remove the chairs," and in response, he told Dr. Backel: "I don't want to do this. These tents

give me anxiety." (*Id.*) Regardless, Plaintiff alleges, he was asked not only to help break down the tent but also to take it to storage by himself because he was "the only man around" and "it was so heavy." (*Id.*) Plaintiff notes that he did not work in the school's facilities department and that "breaking down tents [wa]s not in [his] job description." (*Id.*) According to Plaintiff, Dr. Backel "showed neglect and apathy toward [his] condition and [his] need for accommodations," and his mistreatment during the event caused him to have a panic attack. (*Id.*)

In May 2023, Plaintiff applied for the position of Head Baseball Coach at Seminole High School. (*Id.*; *see* Dkt. 1-13.) Plaintiff attaches to his complaint the résumé he submitted for the position, as well as emails he exchanged with the school's athletics director concerning the position. (Dkt. 1-13.) The résumé describes his college-baseball and coaching experiences and lists players he coached who were drafted into Major League Baseball. (*Id.* at 4.) The email Plaintiff wrote to follow up on his application includes the names, coaching positions, and phone numbers of two references. (*Id.* at 2–3.) Ultimately, Plaintiff claims, he was not invited to interview for the position. (*Id.* at 1; Dkt. 1 at 7.) The position allegedly "remained open during the summer and took" three months to fill. (Dkt. 1 at 7.) Plaintiff states that he emailed about the position on June 8, 2023, and did not receive a reply. (*Id.*) He alleges that the decision not to hire him "led to a loss of additional income and opportunity to advance in [his] professional career." (*Id.*)

In September 2023, Plaintiff claims, "[a] student was transferred to [him] to

begin the school year when she should have been withdrawn instead." (*Id.*) Allegedly, although Dr. Backel "agreed" with Plaintiff that the student "should not have been transferred from summer" enrollment, and although Dr. Backel "control[led] who [wa]s transferred," Dr. Backel did not correct the transfer. (Dkt. 1-5 at 1.) According to Plaintiff, because of the student's withdrawals and reinstatements in the course, (*see* Dkt. 1-6 at 2–3), she ended up being "enrolled for [twenty-nine] weeks out of [sixteen]," which Plaintiff calls "out of compliance with the F[lorida] Dep[artmen]t of Education," (*id.* at 1 (emphasis omitted)). Further, Dr. Backel purportedly contravened a policy from the faculty handbook when she instructed Plaintiff to grade the student's last assignment in less than fourteen hours. (*See id.* ("That assignment was submitted last night at 10:36. Please grade it and complete her course today by noon."); *see also* Dkt. 1 at 7.) Essay assignments aside, the handbook required teachers to complete each assignment's grade "within [forty-eight] hours of [the assignment's] submission" and to support each grade with feedback "personalized to the student and the assignment." (Dkt. 1-10 at 1.) Plaintiff alleges that he was treated differently from the other teachers at his school, who had forty-eight hours to grade. (Dkt. 1 at 7.)

In November 2023, SCVS administration allegedly asked Plaintiff to proctor the Preliminary SAT (PSAT) exam at a physical high school despite his accommodation to work from home. (*Id.*) During the exam sessions, Plaintiff states, he voiced "complaints about a number of irregularities by the testing team," but these complaints "were ignored, which triggered a panic attack in front of the testing students and staff." (*Id.*) Plaintiff claims that "[i]n retaliation," Mrs. Beamon put him on administrative

leave pending a psychiatric evaluation into his fitness for duty. (*Id.*; *see* Dkt. 1-4 at 1.) According to a letter from Mr. Russi attached to the complaint, the leave was "with full pay and benefits," and the evaluation was "set up through the [h]uman [r]esources [d]epartment" and paid for by the school board. (Dkt. 1-4 at 1.) Plaintiff describes this incident as "a failure to accommodate." (Dkt. 1 at 7.)

On June 14, 2023, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC) alleging that Defendant committed disability discrimination against him. (Dkt. 1-2 at 1.) Plaintiff discussed three incidents on the charge form. (*Id.*) First, he stated that around December 2018, he reported discrimination "and a lack of support at [his] workplace" and that it was "evident" to him that Defendant was "target[ing]" him "instead of addressing [his] training needs." (*Id.*) Second, he claimed that around November 2021, Defendant "papered [his] employee file as an adverse action" and "did not provide [him] the same [c]ivility [c]lause protection that [it] provide[d] other employees." (*Id.*) He alleged that this second incident was "retaliatory" for a previous charge of discrimination against Defendant, and he provided the case number related to the previous charge. (*Id.*) Third, he described the May 2022 incident at the 8th Drive Through. (*Id.*) He identified May 19, 2022, as the date of the most recent discriminatory employment action, presumably referring to the third incident. (*Id.*)

On February 5, 2024, the EEOC issued a notice to Plaintiff indicating its decision not to "proceed further with its investigation" and informing Plaintiff of his right to sue Defendant within ninety days of his receipt of the notice. (Dkt. 1-1 at 1.)

Plaintiff states that he received the notice on March 27, 2024. (Dkt. 1 at 9.) On May 3, 2024, Plaintiff initiated this action by filing in this court a Northern District of Florida form for pro se plaintiffs alleging employment discrimination under Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, or the ADA. (*See id. passim*.) Plaintiff bases the court's subject matter jurisdiction on the ADA alone, (*see id.* at 3–4), and identifies major depression as his disability, (*id.* at 10). However, when Plaintiff filled out the form, he answered a question about administrative exhaustion intended for plaintiffs "asserting a claim for age discrimination." (*Id.*)

Plaintiff claims both that the discriminatory acts at issue occurred from 2016 to November 2023, (*id.* at 8), and that the discrimination is "still being committed," (*id.* at 11). According to Plaintiff, the discrimination involves failure to hire, failure to accommodate disability, unequal terms and conditions of employment, and retaliation. (*Id.* at 8.) Plaintiff asserts that Defendant denied his request for a reasonable accommodation when instead of allowing him to work virtually, it required him to attend the off-campus luncheon in 2016, to take down the tent at the 8th Drive Through in 2022, and to proctor the PSAT in 2023. (*Id.* at 10.)

Plaintiff seeks monetary and injunctive relief. (*Id.* at 11–12.) For monetary relief, Plaintiff seeks "[e]conomic damages caused by [the] loss of [a] stipend, negative performance reviews [that have] not align[ed] with parental reviews, . . . [an] ongoing and systemic . . . hostile work environment, [and] harassment based on [his] protected status," which is ongoing, "present, severe, and distracting to [his] job duties." (*Id.* at 11.) For injunctive relief, Plaintiff asks that the court require Defendant to "[m]odify

[its] policies" for "ADA compliance," to furnish him with a "[p]ositive reference letter, [to] reasonably accom[m]odate" his disability, to "instate[]" him in a position, and to undergo "[d]isab[i]lity training." (*Id.* at 12.)  Plaintiff also "seeks [the] costs and fees involved in litigating this case and such other relief as may be appropriate, including attorney[] fees, if applicable." (*Id.*)

## APPLICABLE STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to "contain . . . a short and plain statement of [a] claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Federal Rule of Civil Procedure 10(b) requires the plaintiff to "state its claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b).  To "promote clarity," Rule 10(b) also requires the plaintiff to state "each claim founded on a separate transaction or occurrence . . . in a separate count." *Id.* "Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). Shotgun pleadings "fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323.  One type of shotgun pleading fails to "separate[e] into a different count each cause of action or claim for relief." *Id.* at 1322–23.  A court should dismiss a complaint as a shotgun pleading "where 'it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'" *Id.* at 1325 (emphasis omitted) (quoting *Anderson*

*v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)).

Although courts "give liberal construction" to documents filed by pro se plaintiffs, *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007), pro se plaintiffs are still "required . . . to conform to procedural rules," *Loren v. Sasser*, 309 F.3d 1296, 1304 (11th Cir. 2002). *See Cummings v. Dep't of Corr.*, 757 F.3d 1228, 1234 n.10 (11th Cir. 2014) ("The right of self-representation does not exempt a party from compliance with relevant rules of procedural and substantive law." (quoting *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981))). Further, the leniency with which courts treat pro se plaintiffs does not permit courts to "serve as de facto counsel" or "rewrite an otherwise deficient pleading." *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998).

## ANALYSIS

Defendant argues that the court should dismiss Plaintiff's complaint as a shotgun pleading, for failure to exhaust administrative remedies, and for failure to state a claim. (Dkt. 7 at 6–19.) Because the court agrees with Defendant that the complaint is a shotgun pleading, the court does not address Defendant's other arguments.

Defendant asserts that the complaint is a shotgun pleading because it "fails to clearly articulate what theories he is proceeding under, is difficult if not impossible to discern, and fails to provide adequate notice to frame a responsive pleading." (*Id.* at 6; *accord id.* at 8.) "Throughout [the] [c]omplaint," Defendant maintains, "Plaintiff impermissibly conflates allegations of retaliation, disparate treatment, harassment, and adverse employment actions." (*Id.* at 6–7.) Defendant further contends that the

complaint "repeatedly asserts conclusory statements[] and vague facts not obviously connected with any cause of action." (*Id.* at 7.)

Plaintiff's counterargument consists of one paragraph devoid of factual or legal citation. (Dkt. 13 at 3.) In this paragraph, Plaintiff states that he "has provided claims . . . separated into paragraphs," has "followed the instructions included in the pro se complaint form," and has sufficiently "claim[ed] that [Defendant's] employees have failed to accommodate, harassed, labeled, retaliated against, and procured adverse employment actions against . . . Plaintiff over the course of Plaintiff's employment." (*Id.*)

To begin with, Plaintiff's counterargument is not persuasive because he does not sufficiently develop it or support it with citations. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (explaining that a party "abandons a claim when he . . . raises it in a perfunctory manner without supporting arguments and authority"); *see also Gundogdu v. LinkedIn Corp.*, No. 23-12706, 2024 U.S. App. LEXIS 8797, at *9 (11th Cir. Apr. 12, 2024) ("Because [the pro se employment discrimination plaintiff] has not supported her claims . . . with citations to the record or legal authority, she has abandoned those claims . . . ."). In any event, the counterargument illustrates the shotgun nature of Plaintiff's claims insofar as it mentions theories of failure to accommodate, harassment (or hostile work environment), and retaliation, among others, without tying these theories to any of the factual allegations in the complaint. (*See* Dkt. 13 at 3.)

Because it is virtually impossible for Defendant to know which facts support

which claims in the complaint, *see Weiland*, 792 F.3d at 1325, the court dismisses the complaint without prejudice as a shotgun pleading. *See Mikov v. Village of Palm Springs*, No. 23-13311, 2024 U.S. App. LEXIS 15526, at *8 (11th Cir. June 26, 2024) (affirming a dismissal without prejudice on shotgun pleading grounds when the complaint "made it overly burdensome to identify which facts support[ed] each claim"). If Plaintiff repleads, he shall pay close attention to this order's directives in order to avoid a future shotgun pleading. *See Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018) ("In the repleading order, the district court should explain how the offending pleading violates the shotgun pleading rule so that the party may properly avoid future shotgun pleadings."). The court cautions Plaintiff that an amended complaint supersedes a previous complaint. *See TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*, 959 F.3d 1318, 1327 (11th Cir. 2020).

If Plaintiff files an amended complaint, he shall "list each cause of action into a separately numbered count, with one legal theory per count." *Harris v. Archie*, No. 23-cv-14392-Can, 2024 U.S. Dist. LEXIS 74705, at *8 (S.D. Fla. Apr. 24, 2024), *report and recommendation accepted by* 2024 U.S. Dist. LEXIS 84406, at *2 (S.D. Fla. May 9, 2024). Plaintiff shall not "lump[] together" multiple theories in one count; instead, he shall "narrow down and separate out his theories of liability" such that each asserted theory gets its own count in the amended pleading, *see Chenault v. Seabulk Vessel Mgmt.*, No. 24-cv-60277-DAMIAN, 2024 U.S. Dist. LEXIS 99051, at *16 (S.D. Fla. June 3, 2024), because "[e]ach distinct theory . . . is a separate cause of action that must be asserted independently and with corresponding supporting factual allegations," *see*

*Ortiz v. Carnival Corp.*, Civil Action No. 20-24838-Civ-Scola, 2020 U.S. Dist. LEXIS 220954, at *2–4 (S.D. Fla. Nov. 24, 2020) (collecting cases).

Within each count, Plaintiff shall tailor his allegations to the elements of the count.  For example, for a disparate treatment claim under the ADA, Plaintiff must plead these three elements: "(1) he is disabled[,] (2) he is a qualified individual[,] and (3) he was subjected to unlawful discrimination because of his disability."  *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255–56 (11th Cir. 2007).  For a retaliation claim under the ADA, Plaintiff must plead these three elements: "(1) that []he engaged in statutorily protected conduct, (2) that []he suffered an adverse employment action, and (3) that a causal connection exists between the two."  *Batson v. Salvation Army*, 897 F.3d 1320, 1329 (11th Cir. 2018).  For a hostile work environment claim under the ADA, Plaintiff must plead these five elements:

> (1) that he belongs to a protected group[,] (2) that he has been subjected to unwelcome harassment[,] (3) that the harassment was based on [his] protected characteristic . . . [,] (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment[,] and (5) that [his] employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Ford v. Sebring Health Servs., LLC*, No. 23-14168-CIV-CAN, 2024 U.S. Dist. LEXIS 198968, at *5–6 (S.D. Fla. Nov. 1, 2024) (alterations adopted) (quoting *Miller v. Kenworth of Dothan Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).

Plaintiff must support each count with factual allegations because "a formulaic recitation of the elements of a cause of action," standing alone, "will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  However, Plaintiff shall incorporate into

each count only those factual allegations necessary to support the count. *See Behr v. Campbell*, No. 9:18-CV-80221-RLR, 2021 U.S. Dist. LEXIS 212712, at *6 (S.D. Fla. Nov. 3, 2021) ("None of the . . . [c]ounts should incorporate every prior paragraph by reference; rather, . . . [the p]laintiff[] shall only incorporate those select paragraphs that support the [c]ount."). Currently, the complaint does not contain separately numbered counts, and thus, it in essence incorporates all allegations into all counts. (*See* Dkt. 1.)

## CONCLUSION

Accordingly:

1. Defendant's motion (Dkt. 7) is **GRANTED**.
2. Plaintiff's complaint (Dkt. 1) is **DISMISSED without prejudice**.
3. If Plaintiff can do so in good faith, he may file an amended complaint on or before January 23, 2025, correcting the deficiencies identified in this order. The court cautions Plaintiff: "[A]n order dismissing a complaint with leave to amend within a specified time becomes a final judgment if the deadline to amend expires without the plaintiff amending its complaint or seeking an extension of time." *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 719-20 (11th Cir. 2020).
4. If the amended complaint fails to correct the deficiencies identified in this order or to comply with any of this order's directives, the court may dismiss the amended complaint without notice to Plaintiff.

- 19 -

**ORDERED** in Orlando, Florida, on January 2, 2025.

_____
JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Unrepresented Parties
Counsel of Record